(No. 44795.—

H. G. CUNNINGHAM, Appellant, v. ROGER C. AESCH-LIMAN, Appellee.

*Opinion filed April 2, 1973.—Rehearing denied June 1, 1973.*

UNDERWOOD, C.J., and WARD and RYAN, JJ., dissenting.

RATHJE, WOODWARD, DYER & BURT, of Wheaton (GERALD J. BROOKE, of counsel), for appellant.

ALLEN S. GREENE, of Wheaton, for appellee.

MR. JUSTICE SCHAEFER delivered the opinion of the court:

The plaintiff, H. G. Cunningham, an Indiana real estate broker, brought this action in the circuit court of Du Page County against the defendant, Roger C. Aeschli-

man, to recover a commission on the sale of a house which the defendant owned in Munster, Indiana, as well as certain cleaning and painting expenses the plaintiff had incurred in preparing the house for sale. A jury was waived, and the trial court entered judgment in favor of the plaintiff in the sum of $4080, representing the commission, and $379 representing the refurbishing expenses. The Appellate Court, Second District, reversed as to the commission but affirmed as to the expenses (*Cunningham v. Aeschliman (1971), 1 Ill. App. 3d 386*), and we allowed the plaintiff's petition for leave to appeal.

The defendant had invested about $6500 in the Indiana house, which was subject to a mortgage. He then moved to Wheaton, Illinois, and wanted to sell the Indiana house. To that end he entered into an exclusive home-listing agreement with the plaintiff on June 14, 1967. The agreement provided that for a period of 90 days the plaintiff was to have the exclusive right to sell the defendant's home for the sum of $75,000, "or with my or our consent for a lesser sum or on other terms." The agreement further provided: "If, during said period the property is sold, or if you, or any member of the Multiple Listing Service of the Calumet Area, Inc., produce a purchaser ready, willing and able to purchase the property; or if within six (6) months after the expiration of said period, a sale is made to any person, directly or indirectly, whom you or any other member of the Multiple Listing Service of the Calumet Area, Inc. may have interested in the property, I or we agree to pay you a commission of 6% of the gross sales or exchange price thereof, provided, however, that this extension clause shall not be applicable and binding during the term said real estate is relisted with some other licensed Realtor under an exclusive listing contract upon or after the term of this listing agreement." The agreement fixed September 1, 1967, as the date upon which possession would be delivered.

After the agreement was executed, the plaintiff

advertised the house for sale and showed it to a number of persons who responded. One of them was accompanied by the wife of the ultimate purchaser, Dr. Vincent Santare. On July 10, 1967, the plaintiff took to the defendant in Illinois Dr. Santare's first offer, which was to purchase for $70,000 on a contract basis, payable $7,000 down and the balance at $500 per month, with interest at 5½%. $500 was paid down with the offer. The defendant rejected that offer and counter-offered to sell for $73,000 on the same terms. Dr. Santare then increased his offer to $71,500. That price was acceptable to the defendant, but he asked for a $10,000 down payment instead of the $7,000 stated in the offer.

Dr. Santare had become concerned about what appeared to be a water problem in the basement of the house, and he hired an engineer who examined the house and recommended that certain corrections be made, including installation of drain tile, reinstallation of window wells, opening an exterior basement wall, tuck-pointing and regrading. These recommendations were communicated to the plaintiff, and on July 17 he set them forth in a letter to the defendant which indicated that Dr. Santare would not buy the house until the corrections were made. Estimates which Dr. Santare had obtained indicated that these corrections would cost $3500. On August 3 Dr. Santare submitted to the plaintiff another offer to purchase for $71,500 with $10,000 down, conditioned on the defendant's making eight of the ten corrections originally recommended by the engineer. The defendant rejected this offer.

During the month of August, relations between the plaintiff and the defendant deteriorated. The plaintiff testified that he had a meeting with the defendant during which the defendant was very antagonistic and accused him of being inept and causing damage to a chair which he had had cleaned. The defendant was also dissatisfied

because the plaintiff had not had the basement walls painted, so that the water marks upon them would not show. The plaintiff testified that he nevertheless continued to try to sell the house until early September when he was informed that the Santares had started to move in. The defendant, on the other hand, testified that his last meeting with the plaintiff took place in the defendant's home in Illinois shortly after August 21, during which he expressed his extreme displeasure with the plaintiff's services and told him that he was "through with the house and I didn't want anything to do with him anymore."

It is undisputed that another written offer of Dr. Santare was transmitted by the plaintiff to the defendant. It was dated August 21, and by its terms was to expire on August 28. This offer proposed purchase for $68,000 and eliminated the requirement that corrections be made. The defendant did not accept this offer, and on August 28 the plaintiff recorded a "Notice of Intention to Hold Mechanic's Lien" against the defendant's property in the amount of $379. By letter dated August 29, the plaintiff returned the $500 earnest money to Dr. Santare, who thereafter inquired of the plaintiff to learn why his offers had been rejected.

Dr. Santare then called the defendant and arranged to meet with him at an unspecified time during the Labor Day weekend. At the meeting the principal topic of discussion was the engineer's report concerning the alleged defects in the house. As a solution, the possibility of a lease with an option to purchase was apparently suggested by the defendant, who was familiar with the tax advantages of a lease. Dr. Santare testified that this suggestion interested him because it would give him an opportunity to live in the house for a period of time to determine if the asserted defects existed, and then to decide whether or not to buy.

The matter was referred to their respective attorneys,

and a lease with an option to purchase was drawn up. The lease was for one year, commencing October 1, 1967, at a rental of $6000 per year, with a privilege to renew for an additional year at $7200 per year. In the lease the owner undertook to make certain corrections, which, as the trial court found, "for the most part were identical with those contained in" Dr. Santare's earlier offer to purchase. Attached to the lease was an option to purchase for $68,000, exercisable after October 1, 1968.

The lease and option to purchase were signed by Dr. and Mrs. Santare, and acknowledged by a notary public on September 5, 1967, which was seven days prior to the expiration of the exclusive listing period. The blanks for the dates of the signatures of the sellers are not filled in, nor are their signatures acknowledged. The defendant testified that he signed these instruments on some unspecified date after the exclusive period expired on September 12. He also testified that the attorneys for himself and Dr. Santare were in the process of negotiating the lease and option prior to September 12, and the trial judge found that "a lease and option to purchase the real estate in question were entered into during the life of the exclusive listing agreement with the plaintiff broker." The Santares moved into the house in late September and exercised the option to purchase about one year later on September 19, 1968. On October 17, 1968, a deed was recorded conveying the home to the Santares for a purchase price of $68,000.

The parties agree that the brokerage contract must be construed under the law of Indiana since it was executed there by persons who were then Indiana residents, and the contract involved the performance of duties in that State with respect to real estate situated there.

While we have found no Indiana cases involving closely similar factual situations, there are Indiana decisions which are of assistance. The agreement required that

the broker "produce a purchaser" or that a sale be made to one whom the broker "may have interested in the property." In *Platt v. Johr (1894), 9 Ind. App. 58, 60-61, 36 N.E. 294, 295,* the court stated:

> "Whether a broker is to 'introduce' a purchaser, or to 'find' or 'procure' one, or whether he is to do all these things combined, his duties remain practically the same. The words 'find,' 'procure,' 'introduce,' are generally used synonymously in the making of such contracts, and, whether used conjunctively or disjunctively, the essential thing they require the broker to do is to secure a customer who is .or will become a purchaser. The logical result of this rule is that the sale must be traced to the introduction of the purchaser to the owner by the agent. Of course, if, after such introduction and as a proximate result thereof, the owner makes the sale himself, either personally or by another agent, it will not exonerate such owner from the payment of commission to the agent who has initiated the negotiations. But if the causal connection between the introducing agent and the procurement of the sale be broken, the first agent is not entitled to any commission."

(See also *Wachtel v. Harkless (1942), 112 Ind. App. 279, 284, 44 N.E.2d 510, 512-13.*) It seems clear that the same meaning would be given to the phrases involved in this contract—"produce a purchaser" and "interested in the property."

Under these decisions the plaintiff "produced" the purchaser of the property. The ultimate sale to Dr. Santare is directly traceable to the lease-option agreement signed by Dr. Santare on September 5, 1967, and that agreement is, in turn, directly traceable to the efforts of the plaintiff. The causal connection was never broken between the sale,

the lease-option agreement, and the fact that the plaintiff had "produced" the purchaser and had "interested" him in the property.

The defendant's argument centers, as did the opinion of the appellate court, upon the date of the exercise of the option to purchase rather than upon the date of the execution of the lease and option contract. And because the option was not exercised and the deed to the property was not delivered until October of 1968, the defendant contends that no sale took place within the time limits stated in the brokerage contract, and that the plaintiff is therefore not entitled to a commission.

In our opinion, this emphasis is misplaced. The brokerage contract provided that possession was to be given to the buyer on September 1, 1967—a term of the contract which we assume would properly be interpreted as calling for immediate possession after that date. By entering into the lease and option contract the defendant not only eliminated Dr. Santare as one of the plaintiff's prospects, but he also made it impossible for the plaintiff to find any other purchaser under the terms of the brokerage contract. And since the ultimate sale was made to one whom the plaintiff "produced" and "interested in the property," we are of the opinion that the trial court properly held that the plaintiff was entitled to recover damages measured by the commission provided in the contract.

In reaching this conclusion we have considered and rejected the various grounds advanced by the defendant to deny the plaintiff a commission. The facts do not support the contention that the plaintiff abandoned his brokerage contract. The evidence clearly shows that the plaintiff continued to advertise the house for sale until September 7, 1967. The fact that he did not show the house to any new prospects after August 22, 1967, is irrelevant to the defendant's theory of abandonment without some proof that he refused to show the house to persons who

expressed interest in it. And the filing of a mechanic's lien in order to protect his investment in the cleaning of the defendant's house and furniture does not show that the plaintiff was unwilling to continue his efforts to sell the defendant's house.

Nor can the fact that the plaintiff permitted the engineer hired by Dr. Santare to inspect the house be considered conduct adverse to the defendant's interest. Dr. Santare had been told by another doctor who had been interested in the house that the basement leaked, and he was unwilling to continue negotiations until he had an engineer inspect the premises. He testified that the plaintiff had never said anything derogatory about the house. If the plaintiff had not permitted the inspection Dr. Santare would almost surely have been lost as a prospective purchaser.

The record does not sustain the defendant's contention that the plaintiff acted adversely to the defendant's interests by soliciting a listing of Dr. Santare's home. Dr. Santare testified that the plaintiff went to his home at the doctor's request, and that the plaintiff told Dr. Santare that "he would not handle my house until I had negotiated the other deal."

The judgment of the appellate court as to the commission is reversed, and the judgment of the circuit court of Du Page County is affirmed.

*Appellate court reversed; circuit court affirmed.*

MR. CHIEF JUSTICE UNDERWOOD, dissenting:

I cannot agree that plaintiff is entitled to recover a commission for the sale of this property under the terms of this contract, and it is *this contract* upon which his cause of action is based. A count predicated upon fraud was voluntarily dismissed by plaintiff, and no *quantum meruit* claim was ever made. Consequently, any right to recover under this listing agreement must be predicated on the occurrence of one of three events: (1) the sale of the

property within 90 days commencing June 14, 1967; (2) the production by plaintiff of a purchaser "ready, willing and able" to buy the property for $75,000, or such lesser sum as might be acceptable to defendant, within that 90-day period; (3) a sale of the property to any person, directly or indirectly, whom plaintiff may have interested in the property, within 6 months following expiration of the exclusive listing period. No amount of discussion by the majority concerning either Dr. Santare's possession of the property or any "causal connection" to a sale can obscure the fact that none of these contractual conditions was met. Nowhere is it suggested that the property was sold prior to September 12, 1967, or that defendant and Dr. Santare reached any agreement during the protracted negotiations that summer; Dr. Santare was not "ready, willing and able" to purchase upon terms to which the defendant would consent. Serious differences separated their bargaining positions during that entire period, and the leasehold arrangement executed in September reflected Dr. Santare's unwillingness to consumate a sale at that time.

It is similarly undisputed that no sale of the property was executed during the 6 months after September 12, 1967, the expiration date of the listing agreement. Dr. Santare did not so obligate himself through exercise of the option until September 18, 1968. The suggestion by the majority that the lease to Dr. Santare somehow "made it impossible for the plaintiff to find any other purchaser under the terms of the brokerage contract" overlooks the precise terms of that agreement. Had plaintiff produced a purchaser willing to pay $75,000 for the property prior to September 12, 1967, it seems clear that he would be entitled to a commission regardless of whether a sale were, in fact, consummated.

It is not uncommon for brokers to show property to persons who are not then disposed to buy but who ultimately purchase after the broker has ceased active solicitation. Whether commissions are due upon those sales

varies with the elapsed times and differing circumstances. The contract here was designated to eliminate such uncertainties. It protected the broker in the case of a sale within 6 months from the expiration date of the agreement, but not thereafter. The majority neglects to mention that the 6-months limitation was the plaintiff's own doing; had he desired more extended protection of his interests, he could have so drafted the brokerage contract which he chose to use.

Contrary to what seems to me to be implied in the majority opinion, I find in the evidence no hint of a scheme to deprive plaintiff of a commission. To the contrary, it is clear that Dr. Santare was seriously concerned about the possibility of water problems in the basement of the house. The lease and option to buy enabled him to determine the effectiveness of the remedial measures taken before he obligated himself to buy, a commitment he was unwilling to make until satisfied that those problems had been eliminated.

I would affirm the judgment of the appellate court.

WARD and RYAN, JJ., join in this dissent.